NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

ANDREA F., JOSHUA W., *Appellant*s,

*v.*

DEPARTMENT OF CHILD SAFETY, E.W., *Appellees*.

No. 1 CA-JV 20-0074
FILED 1-19-2021

---

Appeal from the Superior Court in Maricopa County
Nos.   JD 36906
JS 19894
The Honorable M. Scott McCoy, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant, Mother*

John L. Popilek PC, Scottsdale
*Counsel for Appellant, Father*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee, Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Chief Judge Peter B. Swann joined.

---

**C A M P B E L L**, Judge:

**¶1**        Andrea F. ("Mother") and Joshua W. ("Father") appeal the termination of their parental rights to Edward.[1] When terminating parental rights, the superior court must make specific findings of fact and conclusions of law to support the termination. Ariz. R.P. Juv. Ct. ("Juvenile Rule") 66(F)(2)(a). Because the findings and conclusions here were insufficient to enable meaningful appellate review, we reverse and remand.

### BACKGROUND

**¶2**        Mother and Father are the biological parents of Edward, born in 2017, and Jacob, who was born in December 2018 and died the following month.[2]

**¶3**        Shortly before Edward's first birthday, his femur was fractured by blunt force trauma. A pediatrician discovered the fracture when Mother and Father took Edward to his one-year well-child checkup in January 2018. Edward's leg was swollen and tender to the touch. Mother told the pediatrician that the child had not been bearing weight on his leg for about a week. The parents offered the pediatrician no explanation for the injury. At the same visit, Edward was diagnosed with failure to thrive.

**¶4**        Jacob was born in December 2018, a healthy infant with no birth complications. In January 2019, Mother nursed Jacob, spending approximately half an hour alone with the baby while Father showered.

---

[1]    Pseudonyms are used for the children to protect their identity.

[2]    The facts recited here are taken from the record in the combined dependency-severance trial.

After the feeding, the baby continued to cry. Mother then left him with Father to go to the store.

¶5            When Mother got home approximately 15 minutes later, Father was holding Jacob, who was "limp," "unresponsive," and "gasping for air." Jacob felt warm to the touch, so Mother took him outside to cool him down while Father searched the internet for possible causes of the baby's maladies. Father's internet searches indicated that Jacob needed urgent medical attention.

¶6            Mother and Father discussed calling an ambulance but decided not to because it would be too expensive. They did not call 9-1-1, their health insurance nurse line, or their pediatrician's office. The parents did not attempt any rescue breathing or CPR. Instead, Mother drove Jacob to a nearby urgent care, arriving about half an hour after she found him in respiratory distress.[3]

¶7            At the urgent care, a nurse quickly took Jacob to a treatment room, called for an ambulance, and summoned an emergency physician. The medical team administered oxygen until the ambulance arrived and transferred Jacob to the nearest hospital. Later, Jacob was airlifted to Phoenix Children's Hospital. He was placed on life support and died ten days later.

¶8            The medical examiner who conducted Jacob's autopsy determined the cause of his death was blunt craniocervical trauma and the manner of death was homicide. The autopsy revealed a skull fracture, subscapular hemorrhages, epidural hemorrhages, bilateral subacute and acute subdural hemorrhages, global hypoxic ischemia encephalopathy, bilateral optic nerve sheath and retinal hemorrhages, multilevel hemorrhages in the dorsal root ganglia and nerve roots of the cervical spine, and fractures of the left femur and left tibia.

¶9            After Jacob was fatally injured, the Department of Child Safety ("DCS") filed a petition to designate Edward, the older boy, dependent and to terminate the parents' parental rights under A.R.S. § 8-533(B)(2). DCS alleged that both Mother and Father either neglected or failed to protect Edward and Jacob from neglect, and that they wilfully

---

[3]        The amount of time was heavily disputed at the hearing. The testimony was inconsistent but would support anywhere from about 20–45 minutes, depending on travel times.

abused Edward and Jacob or failed to protect the children from willful abuse by the other parent. The abuse and neglect resulted in Edward's fractured femur and, ultimately, Jacob's death.

¶10 At a combined dependency-termination trial, DCS called a nurse practitioner on the Child Protection Team at Phoenix Children's Hospital to testify. Mother called an associate professor of pediatrics who is board-certified in pediatric emergency medicine and child abuse pediatrics. The nurse practitioner testified the break of Edward's femur occurred 10–14 days before the x-ray was taken; Mother's expert said it happened more than six or seven days before. Both agreed the fracture was highly suspicious of non-accidental trauma. According to the nurse, Mother told her Edward's femur was fractured by getting caught in a crib rail. At trial, however, Mother acknowledged the explanation came from the diagnosing pediatrician and offered no other cause for the fracture.

¶11 Additionally, Mother testified Father was to blame for Jacob's death. Father exercised his Fifth Amendment right to decline to testify about either child's injuries. Both the nurse practitioner and Mother's expert witness testified that Edward's injury would have been painful.

¶12 After the hearing, the superior court issued a minute entry order stating that it intended to grant the severance and directed DCS to lodge proposed findings of fact and conclusions of law. The court ultimately adopted the DCS findings and conclusions in large part, terminating Mother's and Father's parental rights. Mother and Father, now divorced, separately appeal.

## DISCUSSION

¶13 Parents have a "fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). That right, however, is not absolute. "The State can terminate parental rights under specified circumstances and procedures," *Michael J. v. Ariz. Dept. of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 12 (2000), as long as the procedures are fair and satisfy due process requirements, *Kent K.,* 210 Ariz. at 284, ¶ 24.

¶14 The Arizona "legislature and supreme court have established significant procedural safeguards to protect the fundamental right at stake in juvenile proceedings." *Francine C. v. Dep't of Child Safety*, 249 Ariz. 289, 295, ¶ 12 (App. 2020). Before it may terminate a parent's

rights, the superior court must find at least one statutory ground for termination under A.R.S. § 8-533(B) by clear and convincing evidence, *Kent K.,* 210 Ariz. at 284, ¶ 22, then determine by a preponderance of the evidence that severance is in the child's best interests, *Sandra R. v. Dep't of Child Safety,* 248 Ariz. 224, 227, ¶ 12 (2020).

**¶15** We will affirm the termination of parental rights unless it is clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.,* 203 Ariz. 278, 280, ¶ 4 (App. 2002). A ruling is clearly erroneous if it is unsupported by substantial evidence. *Desiree S. v. Dep't of Child Safety*, 235 Ariz. 532, 534, ¶ 7 (App. 2014); *see also Mealey v. Arndt,* 206 Ariz. 218, 221, ¶ 12 (App. 2003) (stating that substantial evidence is any relevant evidence that allows a reasonable mind to draw the same conclusion). The court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We therefore view the evidence in the light most favorable to upholding the verdict. *See Maricopa Cnty. Juv. Action No. JD–5312*, 178 Ariz. 372, 376 (App. 1994).

**¶16** When the superior court finds that a petitioner has met its burden of proof for severance, the court must "[m]ake specific findings of fact in support of the termination of parental rights," Juvenile Rule 66(F)(2)(a), which must be "in the form of a signed order or set forth in a signed minute entry," Juvenile Rule 66(F). *See also* A.R.S. § 8-538(A) ("Every order of the court terminating the parent-child relationship . . . shall be in writing and shall recite the findings on which the order is based . . . ."). The court must specify at least one factual finding to support each of its conclusions of law. *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 240, ¶ 22 (App. 2012). Additionally, "[f]indings must include all of the 'ultimate' facts—that is, those necessary to resolve the disputed issues." *Id.* at 241, ¶ 25 (quotation marks omitted) (citing *Elliott v. Elliott*, 165 Ariz. 128, 132, (App. 1990)). We review the sufficiency of findings of fact de novo as a mixed question of fact and law. *Murphey Farrell Dev., LLLP v. Sourant*, 229 Ariz. 124, 128, ¶ 13 (App. 2012).

## I. The superior court's Under Advisement Ruling did not violate Mother's or Father's due process

**¶17** Mother and Father each argues the superior court's Under Advisement Ruling minute entry violated their rights to specific findings of fact. In its entirety, the minute entry read:

5

> The Court took this matter under advisement after receipt of written closing arguments from all parties. After careful consideration,
>
> **THE COURT FINDS** that DCS has established by clear and convincing evidence grounds to terminate the parental rights of both Mother and Father.
>
> **THE COURT FURTHER FINDS** by a preponderance of the evidence that it is in [Edward's] best interests to terminate the parental rights of both parents.
>
> Because the Court intends to grant the severance,
>
> **IT IS ORDERED** that DCS lodge proposed findings of fact and conclusions of law on or before February 11, 2020.

Mother argues the minute entry lacked the specificity required to determine:

> what grounds were alleged, what evidence the court found persuasive, what witnesses the court found credible . . . and whether it believed Mother (or Father, for that matter) abused [Jacob] or [Edward], or whether the court believed that Mother (or Father) failed to protect [Jacob] or [Edward] from abuse.

Father argues that "[f]rom [the minute entry], it is impossible to glean which of the Department's many theories the trial court accepted."

**¶18**          Had that minute entry been the final order of the court, the parents' argument would be valid. That is not the case. While the minute entry would be insufficient by itself to satisfy constitutional and statutory requirements, it was not the superior court's final order in the matter. After DCS filed its proposed findings and conclusions, the court reviewed and revised them. The court then signed and issued the revised version as a final order. Accordingly, Father's and Mother's argument directed to the minute entry order is without merit.

**II.    The court did not err by ordering proposed findings of fact and conclusions of law or by adopting them, as revised**

**¶19**          Mother next argues it is unfair, under *Santosky v. Kramer*, "to have the court abdicate [to DCS] its responsibility" to make its own

6

findings of fact and conclusions of law. 455 U.S. at 754. Father points to *Elliott*, where this court held that the superior court has "a duty to exercise its independent judgment in making findings concerning [the] facts" on which it bases a severance order. 165 Ariz. at 135. Father argues that, by adopting DCS's proposed findings and conclusions with only a few changes, the court did not satisfy this duty.

¶20 DCS contends that Mother and Father waived this argument by failing to object below to the order directing DCS to lodge findings and conclusions. Courts consistently hold that when a party has properly invoked a *rule* allowing the party to request findings and conclusions, *see* Ariz. R. Civ. P. 52(a), and the court fails to make the requisite findings, the party waives the error by not bringing it to the court's attention in a post-judgment motion. *Trantor v. Fredrikson*, 179 Ariz. 299, 301 (1994); *Elliott*, 165 Ariz. at 134. However, "[a] party cannot waive a requirement that our legislature has imposed upon the juvenile court for the primary purpose of aiding an appellate review." *Francine C.*, 249 Ariz. at 298, ¶ 25. Under A.R.S. § 8-538(A), every severance order must be in writing and state the findings on which the order is based. "The primary purpose for requiring a court to make express findings of fact and conclusions of law is to allow the appellate court to determine exactly which issues were decided and whether the lower court correctly applied the law." *Ruben M.*, 230 Ariz. at 240, ¶ 24. Accordingly, Mother and Father could not and did not waive their argument that the severance order here failed to comply with the statute.

¶21 When the superior court is required to make findings concerning the ultimate facts of a case, as under A.R.S. § 8-538 and Juvenile Rule 66, "[i]t may adopt proposed findings that the parties submit, but only if those findings are consistent with the ones that it reaches independently after properly considering the facts." *Elliott*, 165 Ariz. at 134. If the proposed findings fail to address all the ultimate facts, the court must supplement them. *Id.* (citing *Fritts v. Ericson*, 87 Ariz. 227, 234 (1960)).

¶22 Mother and Father have not shown that the superior court here abdicated its responsibility to make findings and conclusions to DCS. The court did not merely sign the proposed findings of fact and conclusions of law. Rather, it amended DCS's proposed findings and conclusions by annotating them with handwritten notes paying close enough attention to correct even a small typo. Whether the court originally penned or merely revised the proffered findings and conclusions is immaterial. The *Elliott* court explicitly permitted the lower

court to "direct the parties to submit proposed findings and conclusions or additional memoranda." *Elliott*, 165 Ariz. at 137. Here, too, the court was free to direct the parties to submit proposed findings and conclusions and was free to adopt any of those findings and conclusions it determined were appropriate.

### III. The Findings and Conclusions are insufficient to enable meaningful appellate review

**¶23** Finally, Father argues the superior court's findings and conclusions failed to address all the ultimate facts of the case and failed "to elucidate which theories it accepted, and to provide any factual basis for its decision." Mother argues the court failed to give details regarding witness credibility or the court's decision-making process.

**¶24** As stated above, the primary purpose of requiring the court that orders a severance to make express findings and conclusions is so the appellate court can determine which issues were decided and whether the court correctly applied the law. *Ruben M.*, 230 Ariz. at 240, ¶ 24. In this context, "findings also serve other important purposes, including prompt[ing] judges to consider issues more carefully because they are required to state not only the end result of their inquiry, but the process by which they reached it." *Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 538, ¶ 18 (App. 2018) (alteration in original) (quotation marks omitted) (quoting *Miller v. Bd. of Supervisors*, 175 Ariz. 296, 299 (1993)).

**¶25** If the superior court fails to make sufficient findings of fact and conclusions of law, the reviewing court "must tailor the proper remedy [for] each case." *Francine C.*, 249 Ariz. at 299, ¶ 27 (quoting *Miller*, 175 Ariz. at 300). The appellate court generally will remand a matter to the trial court for further findings but "it may also decide an appeal without those findings if it is in a position to do so." *Miller*, 175 Ariz. at 300. "Where the record is so clear that the appellate court does not need the aid of findings, the court may waive such defect on the ground that the error is not substantial in that case." *Francine C.*, 249 Ariz. at 299, ¶ 27. However,

> [w]here the basis on which the court reached a certain conclusion is not clear, it is not enough that the appellate court is able to derive bases on which the trial court could have permissibly reached the decision it did from the record. It must be clear how the court actually did arrive at its conclusions. Otherwise, there is no assurance that the court itself thought out each issue, and an appellate court cannot

effectively review the decision-making process of the trial court.

*Id.* at 297, ¶ 19 (citing *Elliott*, 165 Ariz. at 135).

**¶26** There is substantial evidence in the record here, recounted in the court's findings and conclusions, to support DCS's argument that Mother and Father committed neglect under A.R.S. § 8-533(B)(2) by failing to obtain timely medical care for Edward when his femur was fractured. Additionally, substantial evidence supports DCS's argument that Jacob was severely abused, resulting in his death. However, the court's findings and conclusions are deficient in three respects. First, neither the minute entry order nor the findings and conclusions identify the statutory grounds on which the superior court made its ruling. Second, the findings and conclusions fail to state which of DCS's alternative theories the court is adopting, or whether it adopted both. That is, the court did not indicate whether it based severance on abuse, neglect, or both, related to Edward, Jacob, or both, for Mother, Father, or both. Third, if the court relied on neglect or abuse of Jacob, it did not specify its grounds for finding Mother or Father unfit to care for Edward. *Sandra R.*, 248 Ariz. at 227, ¶ 27 ("[A] juvenile court is encouraged to make express findings concerning the risk of harm to non-abused children.").

**¶27** Until the superior court clarifies the findings and conclusions, we are unable to meaningfully review Mother's and Father's remaining arguments.

## IV. Dependency

**¶28** One final issue requires review even though it was not raised by any party. The record fails to contain an initial finding of dependency. "Before the State may interfere with a parent's right to parent his or her child, it must prove the child is dependent under A.R.S. § 8-201(15)(a)." *Francine C.*, 249 Ariz. at 295, ¶ 12. When the superior court finds the State has proven the allegations in a dependency petition by a preponderance of the evidence, it must "[s]et forth specific findings of fact in support of a finding of dependency and adjudicate the child dependent." Juvenile Rule 55(C), (E)(3); *see also* A.R.S. § 8-844(C)(1)(a)(ii) (the court must provide "[t]he factual basis for the dependency"). The court's findings and conclusions "shall be in the form of a signed order or contained in a minute entry." Juvenile Rule 55(E). In a dependency proceeding, as with termination, the superior court need not detail every fact that supports its ruling, *Christy C. v. ADES*, 214 Ariz. 445, 451—52, ¶ 19

(App. 2007), but its findings must include all of the "ultimate facts," *Ruben M.*, 230 Ariz. at 241, ¶ 25.

**¶29** This case proceeded as both a contested dependency hearing and severance trial. However, the court's minute entry and its final order are silent regarding a finding and adjudication of Edward's dependency. On remand the court should explicitly enter a finding of dependency before proceeding to severance.

## CONCLUSION

**¶30** We reverse and remand this case to the superior court for entry of factual findings and conclusions of law consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED:    AA